UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO. 4:13CV-00047-JHM

ANDY DELAMAR d/b/a JERI'S CAFÉ                                                         PLAINTIFF

VS.

LINDA MOGAN, SUPERVISING ADJUSTER;
CUNNINGHAM LINDSEY U.S., INC.;
PENN-STAR INSURANCE COMPANY; and
GLOBAL INDEMNITY GROUP, INC.                                                         DEFENDANTS

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants Cunningham Lindsey U.S., Inc., Penn-Star Insurance Company, and Global Indemnity Group, Inc.'s Motion for Summary Judgment [DN 23]. Fully briefed, this matter is ripe for review.

### I. INTRODUCTION

This case stems from a fire at Jeri's Café on August 12, 2012. Plaintiff Andy Delemar d/b/a Jeri's Café owned and operated the restaurant located at 9109 State West Route #132 in Clay, Kentucky (the "Building"). Jeri's Café was the named insured on a commercial property and general liability insurance policy issued by Penn-Star Insurance Company ("Penn-Star") under Policy No. PAC6984049 (the "Policy"). The Policy had a coverage limit of $150,000 for the Building and $40,000 for Business Personal Property. [Ex. C: Certified Policy, DN 23-17, at 55].

On the day of the fire, Delamar immediately notified Penn-Star of the incident. Eric Kehs of Global Indemnity Group, Inc. ("Global Indemnity") sent a letter to Delamar on the next day confirming that Penn-Star had received Plaintiff's claim. Global Indemnity assigned the

claim to insurance adjuster Linda Mogan of Cunningham Lindsey U.S., Inc. ("Cunningham Lindsey"). On August 14, 2012, Mogan issued her first report to Kehs concerning the fire at the Building. Mogan's first report contained the following description of the damage done to the Building:

> The roof of the main restaurant building is about 75% burned away and there is extensive fire damage to that portion of the building. There is heavy smoke and water damage to the remainder of that portion of the building. It is an obvious total loss. There is moderate smoke damage to the hallway that connects the main building to the new addition. The new addition does not appear to be damaged, although there may be some light smoke damage to the metal ceiling.

[Ex. D1: 8/14/12 letter, DN 23-19, at 2]. In addition to Mogan's inspection of the Building, Mark Boaz from Donan Engineering investigated the Building to locate the cause of the fire. Based on Delamar's description of how the fire occurred, Boaz inspected the exhaust fan to determine whether the fire could have originated from it. Id. at 1-2. However, he concluded the fire started in a trash can in the northeast corner of the kitchen, but he did not believe the fire was intentionally set. Id. at 2.

On August 15, 2012, Delamar contacted an architect to provide him with an estimate of reconstruction costs. [Aff. of Delamar, DN 26-1, at 3]. However, Delamar was instructed by the second fire investigator, Doug Burns, not to do anything to the Building until he could complete his investigation. Id. Soon after meeting with the second investigator, Delamar received a $40,000 check from Global Indemnity for a partial payment on the Building. [Ex. 2: Global Check for Partial Payment, DN 26-3, at 1]. Then, on August 27, 2012, Delamar contacted Mogan about obtaining additional money for debris removal. [Aff. of Delamar, DN 26-1, at 4]. According to Delamar, Mogan informed him that

> (i) there was no additional coverage for debris removal (even though it appeared to her from the policy that such coverage existed), (ii) I would have to hire someone or remove the debris myself, and (iii) however much it cost me would

2

> come out of my policy coverage limit of $40,000 for business personal property, money which I had not yet received (even though I had sent back the contents/inventory forms she had me fill out) nor did I know if I ever would.

Id.

On September 14, 2012, Mogan contacted Delamar in order to settle the claim. According to Delamar, during the conversation, Mogan told him that Global Indemnity was "penalizing" him for being underinsured. [Aff. of Delamar, DN 26-1, at 5]. Delamar assumed that Mogan was mistaken because he had actually increased his Policy limits on the Building in April of 2012. Id. at 2. Plaintiff raised his Policy limits after receiving an appraisal of his property conducted in April of 2011 by Tradewater Wildlife & Land Management LLC. Based on the appraisal, Delamar believed the actual cash value of the Building was $114,000, and therefore, Delamar increased his coverage limits from $80,000 for the Building and $20,000 for Business Personal Property to $150,000 for the Building and $40,000 for Business Personal Property. Id. at 2. Despite the increase in coverage, Mogan asked him to accept the underinsurance penalty and settle with Penn-Star for $125,000. [Aff. of Linda Mogan, DN 23-18, at 3]. Delamar refused Mogan's offer to settle. Id. On the day prior to Mogan's offer for a settlement, Kehs sent a letter to Delamar concerning the status of his claim. The letter stated as follows:

> As you are aware, your fire damage claim with Penn - Star Insurance Company remains open. Your file remains open for the following reason:
>
> We are waiting to finalize all damages through our Independent Adjuster. We are also looking into the coinsurance issues regarding the policy. Once we have received the breakdown of damages and co-insurance, we will review the claim for payment. We have currently paid $40,000 in up front money for repairs to begin.

[Ex. B2: 9/13/12 Letter, DN 23-6, at 1]. Along with the letter, Delamar also received another check for $40,000 which was the full extent of his Policy limits for Business Personal Property.

On September 19, Delamar received the following written explanation as to Penn-Star's settlement offer in a letter from Mogan:

> As we have discussed previously, your policy has an 80% coinsurance clause in the policy, which has a penalty if you do not carry enough coverage to equal 80% of the actual cash value of the Building. . . .
>
> We have estimated the replacement cost for the main building and the new addition to be $502,960.59 and after depreciation the actual cash value is $420,934.28. This amount multiplied by 80% equals insurance required $336,747.42. You have $150,000.00 coverage on the building. This amount divided by insurance required $336,747.42 equals a coinsurance factor of .445.
>
> We estimated the value of the main building alone after depreciation to be $220,130.28; the value of hallway repairs $3,486.29; debris removal (at the lower estimate you submitted) $34,500.00 and value of roof repairs to the new addition $1,444.50. These amounts total an actual cash value loss of $259,561.07. This amount multiplied by the coinsurance factor of .445 equals an actual cash value claim of $115,504.68. Per our telephone conversation with you 09/14/2012, Penn-Star Insurance Company has offered to settle the claim on the Building in the amount of $125,000.00 in order to expedite an amicable settlement.

[Ex. D2: 9/17/2012 Letter].[1] Soon after receiving this letter, Delamar retained Jon Fritz as counsel to handle his case. According to Delamar, his attorney left a voicemail with Kehs on September 19, 2012 to inform him that Delamar had retained counsel and to inquire about the coinsurance issue. A month passed before Delamar heard from Defendants again concerning his claim. Instead of getting a response from Kehs, Delamar said that he received a call from Mogan offering him the same settlement amount as provided in her letter. Delamar refused this offer and told Mogan that he would settle for the full Policy limit on the Building and for the cost of debris removal. Delamar also informed Mogan that he had additional claims that he believed were covered under the Policy. As a result, Mogan told Delamar to provide all this information in writing.

---

[1] It should be noted that Mogan's original report to Kehs in August did not factor the Actual Cash Value of the addition to the main building when calculating the coinsurance factor. As a result, Mogan's first valuation found a coinsurance factor of .85. [Ex. D1: 8/14/12 letter, DN 23-19, at 2].

On November 8, 2012, Fritz, Delamar's attorney, emailed Kehs with questions concerning various issues of coverage as well as providing a counteroffer of $259,588.74. [Ex. 8: 11/08/2012 Letter, DN 26-9, at 2]. Kehs responded to Fritz's email on November 14, 2012. [Ex. B3: 11/14/12 Letter, DN 23-7]. Kehs' letter essentially reiterated most of the points of contention that Mogan had discussed with Delamar, including the application of the coinsurance clause to Delamar's damages and issues regarding coverage for the addition to the Building. Id. at 8-9. Also, Kehs requested that Delamar supply him with any additional claims that he wished to make under the Policy. Id. at 8. Finally, Kehs noted in the letter that Penn-Star had issued a check for the sum of $75,618.29 to bring the total amount paid to Delamar to $115,618.29 for the Building. Id. at 9. This was the sum that Penn-Star believed it owed Delamar under the Policy.

Following Kehs' November 14, 2012 email, the parties exchanged several more emails concerning the April 29, 2011 appraisal for the Building conducted by Tradewater. By December 27, 2012, Kehs offered Delamar $137,500 to settle his claim. Due to some personal issues, Fritz did not provide a response to Kehs' offer to settle until March 3, 2013. At that time, he indicated that Delamar wanted to reject Kehs' offer, but Fritz guessed that his client would settle somewhere between $177,000, which was based on the $40,000 already paid plus the $137,500 offered, and Delamar's counteroffer of $340,000. [Ex. B10: 3/3/13 Letter, DN 23-14, at 1]. In response, Kehs noted that Delamar's Policy did not cover many of the claims that Fritz listed, including mental anguish. [Ex. B11: 3/6/12 Letter, DN 23-15]. Again, Kehs informed Fritz that there was a $150,000 policy limit and that Delamar's $340,000 counteroffer clearly exceeded that amount. Id. Lastly, Kehs reminded Fritz that Delamar could opt to use the Policy's binding appraisal process to determine a final award. Id.

Plaintiff filed this action on April 1, 2013. Plaintiff's Complaint alleges the following: (1) Global Indemnity breached the contract of insurance (Count I); (2) Defendants violated the Kentucky Unfair Claims Settlement Practices Act ("KUCSPA") (Count II); (3) Defendants breached the duty to act in good faith in their communications with Plaintiff and the handling of Plaintiff's claim (Count III); (4) Defendants violated KRS 304.12-235 by failing to make a good faith attempt to resolve Plaintiff's claim within thirty days from notice of the claim (Count IV); and (5) Defendants violated the Kentucky Consumer Protection Act ("KCPA") (Count V). [Compl., DN 1-1, at 6-10].

## II. SUMMARY JUDGMENT

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not

6

establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard the Court reviews the following facts.

### III. ANALYSIS

**A. Claim for Breach of Contract of Insurance Against Global Indemnity**

Plaintiff contends that the Policy clearly made Global Indemnity a party to the contract and that Global Indemnity failed to pay the full limits of the Policy. Thus, Global Indemnity breached the contract of insurance. In response, Defendant Global Indemnity asserts that it cannot have breached the contract of insurance with Plaintiff because it was not a party to the contract. Global Indemnity explains that the Policy clearly stated that Jeri's Café was the insured and that Penn-Star was the insurer. In fact, Global Indemnity notes that it does not even issue insurance policies.

To establish a breach of contract claim in Kentucky, Plaintiff must demonstrate three things: 1) existence of a contract; 2) breach of that contract; and 3) damages flowing from the breach of contract. Metro Louisville/Jefferson County Government v. Abma, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (citation omitted). Plaintiff relies on essentially two theories to establish that Global Indemnity was a party to the contract. Plaintiff's first theory linking Global Indemnity to the Policy involves the page detailing information about Global Indemnity's privacy policy. This page provides as follows:

> We at Global Indemnity Group, Inc. which includes Diamond State Insurance Company, Penn-America Insurance Company, Penn-Patriot Insurance Company, Penn-Star Insurance Company, United National Insurance Company, United National Casualty Insurance Company, United National Specialty Insurance Company and our affiliated companies and subsidiaries, are required to protect our customers' nonpublic personal financial information.

7

> We collect your nonpublic personal financial information from the following sources:
>
> - Information obtained from you, including information from your application, such as name, address, telephone number, social security number, assets and income.
>
> - Information about transactions and experiences, such as your premium payment and claims history.
>
> - Information from a consumer reporting agency, such as your credit history.
>
> WE DO NOT DISCLOSE YOUR NONPUBLIC PERSONAL FINANCIAL INFORMATION, EXCEPT AS PERMITTED OR REQUIRED BY LAW. WE RESERVE THE RIGHT, HOWEVER, TO CHANGE THIS POLICY AT ANY TIME. SHOULD THIS POLICY CHANGE WE WILL GIVE AFFECTED CUSTOMERS AN OPPORTUNITY TO DIRECT THAT THEIR NONPUBLIC PERSONAL FINANCIAL INFORMATION NOT BE DISCLOSED.
>
> We maintain electronic, physical and procedural safeguards that comply with Federal regulations to protect your nonpublic personal financial information. We limit access to your nonpublic personal financial information to those employees who need to know that Information to perform their job responsibilities.
>
> We disclose nonpublic personal financial information of former customers to affiliated and nonaffiliated third parties as permitted by law.

[Policy, DN 23-17, at 4]. Of course, the main problem with relying on this section is that Plaintiff's breach of contract claim is not based upon a breach of the privacy statement. Moreover, the information on that page is replete with any mention of Global Indemnity being a party to the Policy or liable to Plaintiff in any capacity. The Policy clearly states that Penn-Star is the insurer and Jeri's Café is the insured. Id. at 3.

Plaintiff's second theory is based on the facts surrounding the handling of the claim. Specifically, Plaintiff notes that not only did the majority of Delamar's contact about his claim

involve Kehs, an agent of Global Indemnity,[2] but also Global Indemnity issued all three of the checks for payment under the Policy. Based on these facts, Plaintiff briefly identifies three legal theories in which to hold Global Indemnity libel for breach of contract under the Policy. Unfortunately, Plaintiff does not take any time to explain how these theories apply in this case other than providing three case citations. Regardless, the facts alleged by Plaintiff do not support his theory of an implied contract,[3] assumption[4] or veil-piercing.[5] Therefore, Plaintiff's breach of contract claim against Global Indemnity is dismissed.

**B. Claims of Bad Faith, Violation of the Kentucky Unfair Claims Settlement Practices Act, Violation of the Kentucky's Consumer Protection Act, and Violation of KRS 304.12-235 Against Global and Cunningham Lindsey.**

Defendants Cunningham Lindsey and Global Indemnity take the position that they cannot be liable for bad faith, violation of the Kentucky Unfair Claims Settlement Practices Act, violation of the Kentucky's Consumer Protection Act, and violation of KRS 304.12-235 because these claims require privity of contract. Although Plaintiff does not respond to the argument concerning Cunningham Lindsey, he argues that Global Indemnity can be held liable for those claims. For the reasons set forth below, the Court finds the lack of privity of contract between

---

[2] Defendants refute that Kehs acted as an agent of Global Indemnity. In his affidavit, Kehs states that he is a claim representative for Penn-Star. Additionally, although the letters sent to Delamar throughout the claim process have "Global Indemnity Group, Inc." as the main letterhead, Kehs' title at the bottom of the letter indicates that he is a "Claims Examiner" for Penn-Star.

[3] Plaintiff asserts that Global Indemnity could potentially be liable for an implied contract. Under Kentucky law, "[a]n implied contract is one neither oral nor written—but rather, implied in fact, based on the parties' actions." Furtula v. Univ. of Kentucky, 438 S.W.3d 303, 308 n. 6 (Ky. 2014) (quoting Hammond v. Heritage Communications, Inc., 756 S.W.2d 152, 154 (Ky.App.1988)). However, there is no evidence presented by Plaintiff to show that Global Indemnity manifested an intent to contract to provide insurance for Plaintiff.

[4] Plaintiff cites to Carrollton Hospitality, LLC v. Ky. Insight Partners II, LP, 2014 U.S. Dist. LEXIS 75285 (E.D. Ky. 2014) with no real explanation of how this case applies to the facts or to its theory of assumption. Nonetheless, there is no evidence supporting a claim that Global Indemnity intended to assume the contract between Plaintiff and Penn-Star.

[5] In determining whether to pierce the veil of a subsidiary "courts give the most emphasis to grossly inadequate capitalization, egregious failure to observe legal formalities and disregard of distinctions between parent and subsidiary, and a high degree of control by the parent over the subsidiary's operations and decisions, particularly those of a day-to-day nature." Inter-Tel Technologies, Inc. v. Linn Station Properties, LLC, 360 S.W.3d 152, 164 (Ky. 2012) (citation and internal quotation marks omitted). Even assuming that Global Indemnity controlled certain day-to-day activities of Penn-Star, there is no evidence of gross inadequate capitalization or egregious failure to observe legal formalities on the part of Penn-Star.

the parties precludes liability for claims based on bad faith, KUCSPA, KCPA, and KRS 304.12-235 against both Cunningham Lindsey and Global Indemnity.

The Court previously visited the question of whether claims for bad faith, violation of KUCSPA, violation of KCPA, and violation of KRS 304.12-235 require privity of contract in its Memorandum Opinion and Order [DN 16] regarding Plaintiff's motion to remand. As to the tort of bad faith and claims under KUCSPA, the Court noted that although Kentucky has yet to directly address whether these claims require privity of contract, the Courts in the Western District have unanimously concluded that they do. See Madison v. Nationwide Mutual Ins. Co., 2012 WL 692598, *2 (W.D. Ky. Mar. 2, 2012). The Court finds no reason to believe that Cunningham Lindsey is not in the same position as Linda Mogan in terms of claims for the common law tort of bad faith and KUCSPA. Thus, consistent with the Court's previous interpretation of Davidson v. American Freightways, Inc., 25 S.W.3d 94 (Ky. 2000), Cunningham Lindsey cannot be liable for bad faith under Kentucky law because it is not "engaged in the business of insurance." See Davidson v. Am. Freightways, Inc., 25 S.W.3d 94, 102 (Ky. 2000) (quoting KRS 304.1-040) ("[T]he UCSPA and the tort of 'bad faith' apply only to those persons or entities (and their agents) who are 'engaged . . . in the business of entering into contracts of insurance.'"). The Court adopts the same reasoning for Plaintiff's claim under KRS 304.12-235 because the statutory section falls within KUCSPA. See Wolfe v. State Farm Fire & Cas. Co., 2010 WL 4930680, at *3 (W.D. Ky. Nov. 30, 2010) ("Given that [KRS 304.12-235] is in the same subtitle and topically related to the Unfair Claims Settlement Practices Act, it would be counterintuitive to believe an adjuster would be individually liable under K.R.S. § 304.12–235 but not K.R.S. § 304.12–230."). Finally, the Court finds no change in law in the Kentucky appellate courts that would persuade the Court to alter its previous ruling.

The remaining claim under KCPA similarly fails against Cunningham Lindsey due to the reasons discussed in the Court's previous Memorandum Opinion. Briefly, "Kentucky Courts have interpreted the Kentucky Consumer Protection Act to 'contemplate an action by a purchaser against [the] immediate seller,' and 'that privity of contract exist between the parties in a suit alleging a violation of the Consumer Protection Act.'" Helton v. American General Life Ins. Co., 2013 WL 2242773, at *5 (W.D. Ky. May 21, 2013) (quoting Skilcraft Sheetmetal, Inc. v. Kentucky Machinery, Inc., 836 S.W.2d 907, 910 (Ky. Ct. App. 1992)). The Court finds no privity of contract between Cunningham Lindsey and Plaintiff. And, although not expressly stated by Plaintiff, the Court must presume that he concedes this point. Therefore, the Court dismisses claims falling under the tort of bad faith, violation of KUCSPA, violation of KCPA, and violation of KRS 304.12-235 against Cunningham Lindsey for the reasons explained in its previous Memorandum Opinion [DN 16].

Turning to the claims against Global Indemnity, the Court relies on the same basis in denying Plaintiff's claims of bad faith, violation of KUCSPA, violation of KCPA, and violation of KRS 304.12-235, as it used in denying Plaintiff's breach of contract claim against Global Indemnity. Again, these claims require privity of contract which does not exist between Global Indemnity and Plaintiff. There is no evidence in this case to suggest that Global Indemnity is "in the business of entering into contracts of insurance." KRS 304.1-040 ("'Insurer' includes every person engaged as principal and as indemnitor, surety, or contractor in the business of entering into contracts of insurance."). Even under the broadest of definitions of insurance, Global Indemnity would have to be obligated to pay Plaintiff for some risk in order to be liable for bad faith. Davidson v. Am. Freightways, Inc., 25 S.W.3d 94, 98 (Ky. 2000) (quoting KRS 304.1-030) ("The broad nature of the definition anticipates that even an individual who is not a licensed

11

insurer might enter into 'a *contract* whereby one undertakes to pay or indemnify another as to loss from certain specified contingencies or perils called 'risks'. . . .'"). There is no contractual language making Global Indemnity liable to Plaintiff. Therefore, the remaining claims against Defendant Global Indemnity are dismissed.

**C. Claims of Bad Faith and Kentucky Unfair Claims Settlement Practices Act Against Defendant Penn-Star**

In order to state a claim for bad faith under Kentucky law, the insured must prove three elements: "(1) the insurer must be obligated to pay the claim under the terms of the policy; (2) the insurer must lack a reasonable basis in law or fact for denying the claim; and (3) it must be shown that the insurer either knew there was no reasonable basis for denying the claim or acted with reckless disregard for whether such a basis existed." Fed. Kemper Ins. Co. v. Hornback, 711 S.W.2d 844, 847 (Ky. 1986) (Leibson, J., dissenting) (adopted by incorporation in Curry v. Fireman's Fund Ins. Co., 784 S.W.2d 176, 178 (Ky. 1989)). Thus, "[a]n insurer is entitled to challenge a claim and litigate it if the claim is debatable on the law or the facts." Wittmer v. Jones, 864 S.W.2d 885, 890 (Ky. 1993) (quotation and internal markings omitted); see also Empire Fire & Marine Ins. Co. v. Simpsonville Wrecker Svc., Inc., 880 S.W.2d 886, 890 (Ky. Ct. App. 1994) ("[A] tort claim for a bad faith refusal to pay must first be tested to determine whether the insurer's refusal to pay involved a claim which was fairly debatable as to either the law or the facts.").

Before discussing the merits of Plaintiff's bad faith claim, the Court must address the section titled "Global Indemnity/Penn-Star Breached the Policy/Insurance Contract" in Plaintiff's responsive brief. The Plaintiff cannot amend his pleadings to assert a claim for breach of contract against Penn-Star in this manner. Desparois v. Perrysburg Exempted Vill. Sch. Dist., 455 F. App'x 659, 666 (6th Cir. 2012) (citations omitted) ("[A] plaintiff may not expand his

12

claims to assert new theories for the first time in response to a summary judgment motion."). Plaintiff's Complaint clearly stated that the only breach of contract claim in this case involved one against Global Indemnity, not Penn-Star. [Compl., DN 1-1, at 6].

Penn-Star challenges Plaintiff on the first element required for proving a bad faith claim under Kentucky law. Specifically, Penn-Star contends that it was not contractually obligated to pay Plaintiff's claim based on the clear language of the Policy. Under the Policy, the "Loss Payment" section provides as follows:

> g. We will pay for covered loss or damage within 30 days after we receive the sworn proof of loss, if you have complied with all of the terms of this Coverage Part and:
>
> (1) We have reached agreement with you on the amount of loss; or
>
> (2) An appraisal award has been made.

[Policy, DN 23-17, at 71]. Penn-Star emphasizes the point that neither criteria (1) nor (2) were met in this case. This fact seems undisputed. However, it is also undisputed that the policy provisions obligate Penn-Star to pay for building loss claims due to fire. Clearly, Penn-Star acknowledges that it owes coverage for Building loss under the Policy, it simply disputes the amount which is owed. For the purposes of this bad faith claim, the Court believes this first element is satisfied.

The second prong asks whether Penn-Star had a reasonable basis in fact for denying Plaintiff's claim and the third prong is whether Penn-Star knew there was no reasonable basis for denying the claim or whether it acted with reckless disregard for whether a basis existed. The analysis in this case differs from that where an insurer denies a claim outright. Here, the insurer did not deny the claim, it simply valued the loss payable under the policy at a figure lower than

what the insured thought was payable. Penn-Star labels this as nothing more than a good faith dispute about the value assigned to the building loss precluding any bad faith claim.

In <u>Farmland Mut. Ins. Co. v. Johnson</u>, the Kentucky Supreme Court, found that an insurer could still be liable for bad faith even though a particular amount owed for a claim could be reasonably disputed. 36 S.W.3d 368, 375 (Ky. 2000). The court offered the following explanation:

> Although matters regarding investigation and payment of a claim may be "fairly debatable," an insurer is not thereby relieved from its duty to comply with the mandates of the KUCSPA. Although there may be differing opinions as to the value of the loss and as to the merits of replacing or repairing the damaged structure, an insurance company still is obligated under the KUCSPA to investigate, negotiate, and attempt to settle the claim in a fair and reasonable manner. In other words, although elements of a claim may be "fairly debatable," an insurer must debate the matter fairly.

<u>Id</u>. Further, the Kentucky Supreme Court appeared to adopt the holding in <u>Zilisch v. State Farm Mut. Auto. Ins. Co.</u>, 196 Ariz. 234, 995 P.2d 276 (2000), which concluded that "whether a claim or the amount of a claim is fairly debatable is a question of fact for the jury and that the fact of a disputed amount does not relieve the insurer of its duty to handle the claim fairly." <u>Farmland</u>, 36 S.W.3d at 376. In determining whether there exists a proper jury question under the <u>Farmland</u> standard, "[t]he appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." <u>Farmland</u>, 36 S.W.3d at 376 (quoting <u>Zilisch</u>, 196 Ariz. at 280).

While acknowledging <u>Farmland</u> as controlling, Penn-Star argues that the Plaintiff has shown no evidence that it violated the KUCSPA. The Plaintiff directs the Court's attention to certain aspects of Penn-Star's handling of the claim. Specifically, Plaintiff identifies seven incidents evidencing bad faith:

  (a) Was instructing Mr. Boaz, the leading fire investigator in the Commonwealth who determined that Mr. Delamar's fire loss was accidental and total, to refrain from filing his written report that would weaken any claims for subrogation and instead hiring a second fire investigator who required Mr. Delamar to arrange a meeting of, among others, the kid who sold him his used gas fryers and a representative of the manufacturer of a countertop toaster Mr. Delamar bought from Walmart reasonable?

  (b) Was sending Mr. Delamar a "DELAY LETTER" on day thirty in good faith?

  (c) Was sending Mr. Delamar a partial payment on his building, but then forbidding him from clearing away the rotten debris, reasonable, or even sensical?

  (d) Was telling Mr. Delamar that there was not additional coverage for debris removal (which there was) and, thus, he would have to pay for debris removal out of his policy coverage limit for business personal property (begging the question – how should he then pay for restocking his restaurant with furniture, equipment and supplies?) a fair and reasonable representation of the policy terms?

  (e) Was paying Mr. Delamar $75,618.29 for an "undisputed payment" after more than three months had elapsed since his total covered loss, and only after he retained an attorney to send Global Indemnity a litigation demand letter, fair, reasonable and in good faith?

  (f) Knowing that Mr. Delamar's claims for additional coverages were applicable and valid, and that Ms. Mogan's valuation, by her own words, was high and needed a second opinion before applying such a drastic coinsurance penalty, was it reasonable for Global/Penn-Star to tell Mr. Delamar that if he was so adamant about not being underinsured, then Global would deem him overinsured and penalize him the same, as well as refuse to even address the additional coverage claims (which more than two years later still have not been addressed)?

[Pl.'s Resp., DN 26, at 21-22].

  Clearly, none of these events, standing alone, show bad faith on the part of the Defendant. However, the Court concludes, just barely, by drawing all inferences in favor of the Plaintiff, the totality of the evidence in this case, if believed by a jury, could support a finding of bad faith. There is some suggestion that Plaintiff was made to jump through hoops for no reason, or at least, there was an attempt at doing so. Some policy provisions were misrepresented to him and some additional claims were neither affirmed nor denied within a

15

reasonable time. The evidence which is most supportive of a finding of bad faith is the fact that Penn-Star attempted to force the Plaintiff to accept a settlement based on a very high co-insurance penalty. This extremely high penalty was based on Penn-Star opinion that the building was underinsured. Penn-Star based this opinion on the adjustor's valuation. However, the adjustor was reluctant to use the high penalty because the valuation software, she found, often resulted in high valuations when used in commercial applications. [Ex. G: Mogan Third Report, DN 26-23, at 1]. The adjustor encouraged Penn-Star to obtain alternative valuations. Id. Instead, Penn-Star sought to settle with the Plaintiff based on this valuation. A reasonable juror might conclude that Penn-Star knew the valuation and the co-insurance penalty was not reasonable.

This is not a very strong case of bad faith by any means, but it is one in which the Court must allow a jury to decide.

**D. Claims of Violation of Kentucky's Consumer Protection Act Against Penn-Star**

The Kentucky Consumer Protection Act ("KCPA") prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce . . . ." KRS 367.170(1). In addition to providing for enforcement by the Attorney General, the KCPA authorizes a private right of action brought by "[a]ny person who purchases or leases goods or services *primarily for personal, family or household purposes* and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170." KRS 367.220 (emphasis added).

Penn-Star argues that because Plaintiff's Policy covers commercial property, it cannot be held liable under KCPA. Based on Stevens v. Motorists Mutual Insurance Company, 759 S.W.2d 819, 821 (Ky.1988), Plaintiff asserts that the Kentucky Supreme Court's broad interpretation of KCPA would cover the sale of insurance for his commercial property. The

Court previously addressed a similar argument in State Auto. Prop. & Cas. Co. v. There is Hope Cmty. Church ex rel. Blacklock, 2014 WL 3648008, at *4 (W.D. Ky. July 23, 2014).  In that case, the Court noted that Stevens applies to homeowner's insurance, not commercial or business property.  Id.  Instead, the appropriate Kentucky case is Keeton v. Lexington Truck Sales, Inc., 275 S.W.3d 723, 726  (Ky. App. 2008) in which the Kentucky Court of Appeals upheld the dismissal of a KCPA claim because the insurance policy was for a commercial vehicle.  Keeton v. Lexington Truck Sales, Inc., 275 S.W.3d 723, 726  (Ky. App. 2008) ("[Plaintiff] did not purchase the truck for personal, family, or household purposes and thus does not fit within the protected class of persons who may file claims under the Act.").  As a result, Plaintiff's KCPA claim against Penn-Star is dismissed.

### III.  CONCLUSION

For the foregoing reasons, Defendants Cunningham Lindsey U.S., Inc., Penn-Star Insurance Company, and Global Indemnity Group, Inc.'s Motion for Summary Judgment [DN 23] is **GRANTED** in part and **DENIED** in part.  It is **GRANTED** as to Count I and V for all Defendants.  It is also **GRANTED** as to Count II, III, and IV for Defendants Cunningham Lindsey and Global Indemnity.  It is **DENIED** as to Count II, III and IV for Defendant Penn-Star.

*Joseph H. McKinley*

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

January 15, 2015

cc: counsel of record